

## Fourth Court of Appeals
### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-24-00130-CV

**IN THE INTEREST OF A.I.R.**, a Child

From the 45th Judicial District Court, Bexar County, Texas
Trial Court No. 2022PA01844
Honorable Kimberly Burley, Judge Presiding

Opinion by:  Beth Watkins, Justice

Sitting:  Rebeca C. Martinez, Chief Justice
Luz Elena D. Chapa, Justice
Beth Watkins, Justice

Delivered and Filed: August 7, 2024

AFFIRMED

Appellant R.R. challenges the trial court's order terminating her parental rights to her child, A.I.R. (born 2022).[1] R.R. argues the evidence is legally and factually insufficient to support the trial court's finding that termination is in the child's best interest. We affirm the trial court's order.

### BACKGROUND

A.I.R. remained in the hospital for several months after he was born, and the Texas Department of Family and Protective Services received three referrals during that time. The first referral, which occurred shortly after A.I.R.'s birth, was because he tested positive for methadone. The second, on October 14, 2022, alerted the Department that he "was in the hospital, with no

---

[1] To protect the privacy of the minor child, we use initials to refer to the child, his biological parents, and his foster parents. TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

visitors [for] over a week." The third, on November 10, 2022, was because R.R. had not visited recently, A.I.R. needed surgery, and R.R. "did not contact the providers to provide consent" for the procedure. After the third referral, the Department "staffed for removal to consent for that surgery."

The Department obtained temporary managing conservatorship over A.I.R., filed a petition to terminate R.R.'s parental rights, and placed A.I.R. with a foster family after his release from the hospital. The Department subsequently filed an amended petition that sought to terminate the parental rights of R.R. and A.I.R.'s father, J.R. R.R. testified that she was aware of the services she was ordered to engage in as a condition of reunification, and she described those services as including parenting classes, individual therapy, domestic violence classes, psychiatric and psychological evaluations, and a drug assessment. The Department ultimately pursued termination of R.R.'s and J.R.'s parental rights.

On November 16, 2023, twelve months after removal, the trial court began a bench trial at which R.R. appeared. The trial continued on January 12, 2024 and January 26, 2024. The trial court heard testimony from six witnesses: (1) R.R.; (2) Cynthya Cruz, the Department caseworker assigned to this case at the time of trial; (3) R.B.-S., one of A.I.R.'s foster mothers; (4) Joel Ortiz, the Department caseworker who removed A.I.R.; (5) a San Antonio police officer, Jordan Stitle; and (6) R.R.'s landlord, Sandra Longoria. On February 13, 2024, the court signed an order terminating R.R.'s parental rights pursuant to Texas Family Code section 161.001(b)(1)(B), (C), (N), and (O) and its finding that termination of R.R.'s parental rights was in A.I.R.'s best interest.[2] R.R. appealed.

---

[2] The trial court also terminated J.R.'s parental rights. He is not a party to this appeal.

## ANALYSIS

R.R. challenges only the legal and factual sufficiency of the evidence on which the trial court relied to conclude that termination was in A.I.R.'s best interest. She does not challenge the sufficiency of the evidence to support the trial court's predicate findings under section 161.001(b)(1)(B), (C), (N), and (O). *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(B) (parent voluntarily left child alone or in another's possession without expressing intent to return and without providing adequate support and remained away for at least three months), (C) (parent voluntarily left child alone or in another's possession without providing adequate support and remained away for at least six months), (N) (parent constructively abandoned child in Department's custody), (O) (parent failed to comply with court-ordered service plan). Accordingly, we must accept those unchallenged findings as true. *See In re S.J.R.-Z.*, 537 S.W.3d 677, 682 (Tex. App.—San Antonio 2017, pet. denied).

### *Standard of Review*

The involuntary termination of a natural parent's rights implicates fundamental constitutional rights and "divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent." *Id.* at 683 (internal quotation marks omitted). "As a result, appellate courts must strictly scrutinize involuntary termination proceedings in favor of the parent." *Id.* The Department had the burden to prove, by clear and convincing evidence, both that a statutory ground existed to terminate R.R.'s parental rights and that termination was in A.I.R.'s best interest. TEX. FAM. CODE ANN. § 161.206; *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *In re S.J.R.-Z.*, 537 S.W.3d at 683.

When reviewing the sufficiency of the evidence supporting a trial court's order of termination, we apply well-established standards of review. *See In re J.F.C.*, 96 S.W.3d 256, 263–64 (Tex. 2002). In reviewing the legal sufficiency of the evidence to support the trial court's findings, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id*. at 345. A factual sufficiency review requires us to consider the entire record to determine whether the evidence that is contrary to a finding would prevent a reasonable factfinder from forming a firm belief or conviction that the finding is true. *See id.* The factfinder is the sole judge of the weight and credibility of the evidence. *Id.* at 346. This is because "the trial judge is best able to observe and assess the witnesses' demeanor and credibility, and to sense the 'forces, powers, and influences' that may not be apparent from merely reading the record on appeal." *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

### Best Interest

### Applicable Law

There is a strong presumption that a child's best interest is served by maintaining the relationship between a child and the natural parent, and the Department has the burden to rebut that presumption by clear and convincing evidence. *See, e.g.*, *In re R.S.-T.*, 522 S.W.3d 92, 97 (Tex. App.—San Antonio 2017, no pet.). To determine whether the Department satisfied this burden, the Texas Legislature has provided several factors[3] for courts to consider regarding a

---

[3] These factors include, inter alia: "(1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological,

parent's willingness and ability to provide a child with a safe environment, and the Texas Supreme Court has used a similar list of factors[4] to determine a child's best interest. TEX. FAM. CODE ANN. § 263.307(b); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). In analyzing these factors, the court focuses on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regul. Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

A best interest finding, however, does not require proof of any particular factors. *See In re G.C.D.*, No. 04-14-00769-CV, 2015 WL 1938435, at *5 (Tex. App.—San Antonio Apr. 29, 2015, no pet.) (mem. op.). Neither the statutory factors nor the *Holley* factors are exhaustive, and "[e]vidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest." *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at *3 (Tex. App.—San Antonio July 25, 2018, pet. denied) (mem. op.). Additionally, evidence that proves a statutory ground for termination is probative on the issue of best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). Furthermore, in determining whether termination of the parent-child relationship is in the best interest of a child, a factfinder may judge a parent's future conduct by her past conduct. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet.

---

or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills [. . .]; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child." TEX. FAM. CODE § 263.307(b).

[4] Those factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the best interest of the child; (6) the plans for the child by these individuals or the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

denied). Finally, we presume that prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a).

*Application*

The Department removed A.I.R. because he needed surgery during a time when R.R. had stopped visiting him in the hospital and neither the hospital nor the Department could obtain a signed consent form from her. The removal caseworker, Ortiz, testified that he had told R.R. that A.I.R. needed a medically necessary surgery "about four times," and "[h]er response was that she would try to make it to the hospital, but she wasn't sure when exactly she could make it, she was still moving items and trying to move into the new home." *See In re J.N.P.*, No. 09-20-00245-CV, 2021 WL 922338, at *4, *10 (Tex. App.—Beaumont Mar. 11, 2021, no pet.) (mem. op.) (considering parent's minimization of and lack of understanding of child's medical needs in best interest analysis); TEX. FAM. CODE § 263.307(b)(12)(A), (B), (F) (trial court may consider whether parent demonstrates "understanding of the child's needs" and ability to provide child with "minimally adequate health and nutritional care" and "care [and] nurturance . . . consistent with the child's physical and psychological development").

At the time of trial, A.I.R. received most of his nutrition through a G-tube. *See* TEX. FAM. CODE § 263.307(b)(1) (trial court may consider child's age and physical and mental vulnerabilities); *Holley*, 544 S.W.2d at 371–72 (trial court may consider child's emotional and physical needs). R.R. testified that A.I.R. received the G-tube "[b]ecause he stopped eating" and "just didn't want to eat." Cruz testified that A.I.R. stopped eating during the time R.R. was not visiting him in the hospital. A.I.R.'s foster mother, R.B.-S., testified that the child attended speech therapy twice a week because "the muscles he needed to swallow were not developed" as a result of being tube-fed in the first months of his life. R.B.-S. testified that A.I.R., who was sixteen

months old when the trial began, could consume baby food and other soft foods by mouth, "but not enough to sustain the caloric intake that he needs."

R.R. testified that she had not undergone training to learn how to care for A.I.R.'s medical needs, including his G-tube. On the first day of trial, she explained she was "starting to" seek the necessary training but had not yet done so because "nobody's been a resource[.]" *See* TEX. FAM. CODE § 263.307(b)(12)(A), (B), (F). That same day, Cruz testified that R.R. had never requested training on how to meet A.I.R.'s medical needs. Cruz later testified, however, that during visits that occurred between the first and second days of trial, R.R. began "ask[ing] questions of his feeding, of how the G-tube works, any type of, like, G-tube cleaning. She asks about his medical. She asks foster parents how [A.I.R.]'s doing, if he's growing, if he's getting any teeth coming in[.]"

As noted above, the second referral the Department received in this case was a report that A.I.R. was in the neonatal intensive care unit with no visitors for "over a week." Ortiz testified, "The concerns [at the time of A.I.R.'s removal] were that mother was not at the hospital and present to establish a maternal bond with the child. And he was not thriving as he should have been because of that." *See Holley*, 544 S.W.2d at 371–72 (trial court may consider "acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one"). Ortiz testified that when he first made contact with R.R., A.I.R. had been in the hospital for three months and R.R. told him she did not know she needed to visit the child. Ortiz further noted that R.R. visited A.I.R. in the hospital twice during his involvement in the case and that at the time of the child's removal, "it had been about a month" since R.R. visited him. *See id.* R.B.-S. testified that when A.I.R. came into her home in March of 2023, it did not appear that he had had any exercise or any significant contact with anyone. She explained, "[H]is head was flat on the back. He could

not roll over. He could not sit up. He had kind of a flat affect, not really any kind of connective affect with anybody."

R.R. had one virtual visit with A.I.R. between his removal in November of 2022 and the first day of trial in November 2023. She had four more virtual visits before the second day of trial in January 2024 and another two before the final day of trial, for a total of seven visits during this case.[5] *See In re M.P.*, 327 S.W.3d 280, 281–82 (Tex. App.—San Antonio 2010, no pet.) (affirming finding that termination was in child's best interest where evidence showed parent "only visited his child four times over a ten-month period"). Cruz testified that during her involvement in this case, R.R. would ask to have visits with A.I.R., but then would not respond to most of Cruz's attempts to arrange the visits. *See* TEX. FAM. CODE § 263.307(b)(10) (trial court may consider parent's willingness and ability to cooperate with and facilitate Department's supervision). R.R. testified that she had not seen A.I.R. in person since he was three-and-a-half months old.

R.R. also testified, however, that she "did not abandon" A.I.R. She testified that she "visited him at least two or three times a week when he was born . . . for about six weeks" but then suffered "a major infection" and was hospitalized herself. *See Holley*, 544 S.W.2d at 371–72 (trial court may consider excuses for parent's acts or omissions). She testified that she resumed visiting A.I.R. after she was released from the hospital but had to stop to prevent the child's father, J.R., from being involved with him.

R.R. agreed she did not sign the consent forms for A.I.R.'s surgery, but she testified this was because J.R. did not allow her to do so. She explained that at the time of A.I.R.'s removal, she "could not care for him" because she "was in a domestic violence situation" with J.R. and wanted to protect A.I.R. from him. *See* TEX. FAM. CODE § 263.307(b)(7) (trial court may consider whether

---

[5] R.R.'s visits with A.I.R. were conducted virtually because R.R. lived in San Antonio and A.I.R. was placed with foster parents who lived near Tyler.

there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home). She testified, for example, that J.R. "broke [her] phone," "busted [her] head open and fractured [her] arms," and "did not let [her] go to visit" A.I.R. R.R. testified that J.R. was no longer part of her life because she was afraid of him. She stated that J.R. sometimes came to her home, but that she did not let willingly him in and she "[had] to call the police all the time."

R.R.'s landlord, Longoria, confirmed R.R.'s report of domestic violence, testifying that the San Antonio Housing Authority had transferred R.R. to her then-current residence "due to the fact that [J.R.] was there causing altercations with her, domestic violence, you know, abuse, fear for her life." Longoria also testified, however, that she was in the process of evicting R.R. due to her failure to pay rent and the presence of "unauthorized guests" in the home. Longoria identified J.R. as one of R.R.'s unauthorized guests. She testified that she had seen J.R. in and around R.R.'s home multiple times, including on January 3, 2024, when she found him "hiding behind the door" inside the home. Longoria also saw J.R.'s belongings in the home. She testified that R.R. had told her she was "trying to make [J.R.] leave the property," but had also told her she "call[ed] him, because she needs his support" and "he's helping her with the child that they have together." *See id.*; *see also In re J.K.G.*, No. 04-23-00755-CV, 2024 WL 350554, at *5 (Tex. App.—San Antonio Jan. 31, 2024, pet. denied) (mem. op.) (considering evidence that appellant mother had not ended relationship involving domestic violence).

Like Longoria, Cruz testified that J.R. appeared to still be part of R.R.'s life, stating that R.R. had admitted to her that she let J.R. into her home approximately a month before trial began. Cruz further testified that she did not believe it was in A.I.R.'s best interest to place him in a situation where he would be around J.R.

The Department also received a referral in this case because A.I.R. tested positive for methadone at birth. R.R. testified that she had a history of drug use "years ago" but stated that for

the last seven years, she had received methadone through a treatment center where she also received counseling. Cruz testified, however, that R.R. never provided a release of information form that would have allowed Cruz to confirm that treatment. Cruz also testified that R.R. missed several drug tests the Department asked her to submit to during this case, including a hair follicle test the trial court expressly ordered her to undergo during trial. Failure to submit to drug testing is relevant to multiple best-interest considerations because the trial court may properly rely on that failure to infer a parent is using illegal drugs. *In re A.M.L.*, No. 04-19-00422-CV, 2019 WL 6719028, at *4 (Tex. App.—San Antonio Dec. 11, 2019, pet. denied) (mem. op); *In re R.S.*, No. 01-20-00126-CV, 2020 WL 4289978, at *7 (Tex. App.—Houston [1st Dist.] July 28, 2020, no pet.) (mem. op.); *In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.). While R.R. testified that none of her caseworkers asked her to undergo or arranged any drug tests other than an oral swab test and a single urinalysis, the trial court was not required to credit R.R.'s testimony on this point over Cruz's. *See, e.g.*, *In re A.N.C.*, No. 04-22-00680-CV, 2023 WL 2297407, at *4 (Tex. App.—San Antonio Mar. 1, 2023, no pet.) (mem. op.).

In addition to the evidence that R.R. failed to submit to drug tests, Longoria testified that she had seen R.R. under the influence. *See In re A.L.S.*, 660 S.W.3d 257, 275–76 (Tex. App.—San Antonio 2022, pet. denied) (recognizing "drug use can destabilize the home and expose children to physical and emotional harm if not resolved"). Furthermore, Officer Stitle testified that on January 3, 2024—after the trial in this case had begun—he responded to a call involving R.R. where she "was attempting to take items from" a convenience store. Stitle testified that when he spoke with R.R. that day, "she didn't appear as though she was there." He described her as incoherent, with slurred speech, and "kind of unsteady on her feet, kind of going back and forth. At times, I had to try to catch her from falling." Stitle testified that R.R. "admitted that she had taken something, a form of narcotics." He later specified that R.R. told him she had taken

methadone, Xanax, and Seroquel, but he testified she did not tell him whether she had a valid prescription for those drugs. He added that R.R. had one of her young children with her during that incident, that she did not appear capable of caring for a child at the time, and that he was concerned for the child's safety.[6] *See id.*

R.R. testified that she did not remember telling Stitle that she had taken Xanax, but she conceded she had taken methadone and Seroquel that day. She testified that she had a valid prescription for Seroquel and that the symptoms Stitle saw resulted from her prescribed dosage being too high. She also testified that she previously had a prescription for Xanax. Cruz testified, however, that when she last reviewed R.R.'s prescriptions, she did not see a prescription for Xanax or Seroquel. And, as explained above, Cruz also testified that R.R. did not provide the releases necessary for Cruz to confirm her methadone treatment. The trial court had the sole authority to resolve any conflict in the evidence regarding R.R.'s drug use. *See In re J.O.A.*, 283 S.W.3d at 346.

Both Cruz and R.R. testified that R.R. had not completed her service plan. Cruz further specified that R.R. had started some of her required services, but had not finished any. "A fact finder may infer from a parent's failure to take the initiative to complete the services required to regain possession of his child that [s]he does not have the ability to motivate [her]self to seek out available resources needed now or in the future." *See In re J.M.T.*, 519 S.W.3d 258, 270 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). Additionally, Cruz testified that R.R. did not begin engaging in services until shortly before the trial began in November of 2023. *See In re A.F.*, No.

---

[6] R.R. testified that she had five children in addition to A.I.R.: an adult child she had raised; a five-year-old who lived with R.R.'s adoptive mother; and a fourteen-year-old, a seven-year-old, and a three-year-old who lived with R.R.'s estranged husband (who was not J.R.). Cruz testified that the three children who lived with R.R.'s husband had been removed from R.R.'s custody and she was only permitted supervised visits with them. R.R. acknowledged the existence of another case with the Department involving the three children, but she testified she had never seen a court order limiting her to supervised visits.

04-20-00216-CV, 2020 WL 6928390, at *3 (Tex. App.—San Antonio Nov. 25, 2020, no pet.) (considering parent's delay in engaging in service plan). The trial court could have reasonably concluded this evidence was probative of R.R.'s parenting skills and, ultimately, A.I.R.'s best interest. *See id.*; *see also In re O.N.H.*, 401 S.W.3d 681, 687 (Tex. App.—San Antonio 2013, no pet.); TEX. FAM. CODE § 263.307(b)(11) (trial court may consider parent's willingness to effect positive changes in a reasonable time).

The trial court could also properly consider the stability of R.R.'s home. *See Holley*, 544 S.W.2d at 371–72. As noted above, Longoria testified that she was in the process of evicting R.R. She also testified that she planned to move forward with the eviction even if R.R. made her past-due rent payments. R.R. testified that she was "looking into" arranging alternative housing, but she had not yet done so by the last day of trial. *See In re A.N.C.*, 679 S.W.3d 311, 330 (Tex. App.—San Antonio 2023, no pet.) (considering caseworker's testimony "that she was concerned Mom could be evicted" in best interest analysis); *In re K.C.R.T.*, No. 02-10-00425-CV, 2011 WL 3426258, at *7 (Tex. App.—Fort Worth 2011, no pet.) (mem. op.) (considering parent's failure to demonstrate ability to maintain suitable housing).

A.I.R. began living with his current foster parents in March of 2023, when he was approximately eight months old. The trial court noted on the record that the foster parents' home was "the only home this child has ever known." *See In re E.D.*, 682 S.W.3d 595, 611 (Tex. App.—Houston [1st Dist.] 2023, pet. denied) ("As the best-interest inquiry is child-centered, we cannot discount or minimize the level of permanence the child has with his foster parents."). R.B.-S. testified that A.I.R. was bonded to her and her wife, their two sons, and another foster child who lived with them and was close to A.I.R.'s age. She described him as "a happy little boy" who "is very affectionate." R.B.-S. further testified that she had been a nurse for 25 years, that she was familiar with A.I.R.'s medical condition, and she knew how to care for his G-tube. She explained

his feeding routine in detail, and she described the developmental strides A.I.R. had made since coming into her care and the steps she and her wife had taken to ensure that progress. R.B.-S. testified that she and her wife want to adopt A.I.R. *See* TEX. FAM. CODE § 263.307(a).

R.B.-S. testified that she did not believe A.I.R. was bonded to R.R. "[b]ecause he doesn't know her." She explained that during R.R.'s virtual visits with A.I.R., R.R. "talks to him and he just kind of does his own thing." Cruz similarly testified that she did not see any indication of a bond between A.I.R. and R.R., and she agreed that he was bonded to his foster family. R.R., in contrast, testified that she believed A.I.R. was bonded with her, explaining: "I know he knows I'm his mother. . . . [W]hen I see him on the camera, I know he is looking at me and trying to recognize me and my voice." She testified that she loved A.I.R. and "anything they ask me for, I'm going to do it."

After reviewing the evidence under the appropriate standards of review, we conclude a reasonable factfinder could have formed a firm belief or conviction that termination of R.R.'s parental rights was in A.I.R.'s best interest. *In re J.F.C.*, 96 S.W.3d at 266. We therefore hold that legally and factually sufficient evidence supports the trial court's best interest finding, and we overrule R.R.'s arguments to the contrary.

## CONCLUSION

We affirm the trial court's order of termination.


Beth Watkins, Justice